Nos. 19-3159 (L)
*Esso Expl. and Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2020

(Argued:  January 22, 2021          Decided: July 8, 2022)

Docket Nos. 19-3159 (L), 19-3361

ESSO EXPLORATION AND PRODUCTION NIGERIA LIMITED, SHELL NIGERIA
EXPLORATION AND PRODUCTION COMPANY LIMITED,

*Petitioners-Appellants–Cross-Appellees*,

– v. –

NIGERIAN NATIONAL PETROLEUM CORPORATION,

*Respondent-Appellee–Cross-Appellant*.

B e f o r e :

SACK and CARNEY, *Circuit Judges*, and KOVNER, *District Judge*.[1]

Appeal from a judgment of the United States District Court for the Southern District of New York (Pauley, *J.*) declining to enforce a $1.8 billion arbitral award (the "Award") against the Nigerian National Petroleum Corporation ("NNPC") and in favor of Esso Exploration and Production Nigeria Limited and Shell Nigeria Exploration and Production Company Limited (collectively, "Esso"). Courts in Nigeria previously set aside the Award in part. Nonetheless, Esso seeks enforcement of the entire Award under the New York Convention. NNPC urges dismissal of Esso's suit for lack of personal jurisdiction and on the basis of *forum non conveniens*, and it opposes the

---

[1] Judge Rachel P. Kovner, of the United States District Court for the Eastern District of New York, sitting by designation.

petition for enforcement on the merits. The district court first rejected NNPC's threshold arguments for dismissal and then denied Esso's petition to enforce the Award on the ground that the Nigerian judgments setting aside the Award are owed comity. It rejected Esso's argument that, under this Court's decision in *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92 (2d Cir. 2016) ("*Pemex*"), those judgments should be disregarded.

We first determine that NNPC has standing on cross-appeal to challenge the denial of its motion to dismiss, even though the district court ruled in its favor on the merits. NNPC has such standing because our partial vacatur on the merits revives the action against it, and it may face an adverse ruling on remand. On considering NNPC's challenges to the district court's denial of its motion to dismiss for want of personal jurisdiction and *forum non conveniens*, we AFFIRM the district court's rulings because its factual determinations were meticulous and its legal conclusions sound.

We then review the district court's denial of Esso's petition. *Pemex* teaches that a district court may decline to afford comity to a foreign judgment setting aside an arbitral award only if that judgment is repugnant to fundamental notions of justice in the United States. We clarify that the four considerations identified in *Pemex* as bearing on that inquiry were particular to that case; they are not necessarily relevant to—and do not govern in—every case applying the fundamental *Pemex* standard. Although the district court should have broadened its analysis under this standard, we ultimately agree with its conclusion, on this record, that U.S. courts owe the Nigerian judgments setting aside the Award comity. We conclude, however, that the district court went too far by refusing to enforce not only those parts of the Award that the Nigerian courts set aside but also those parts of the Award that remain viable under the Nigerian judgments. We thus AFFIRM IN PART and VACATE IN PART the district court's judgment on the merits of Esso's petition. We REMAND to the district court to formulate, with the aid of the parties in delineating the effects of the Nigerian judgments, a partial enforcement order consistent with this Opinion.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.

———————

AARON R. MARCU (Elliot Friedman, David Y. Livshiz, Shannon M. Leitner, Paige von Mehren, Christian Vandergeest, *on the brief*), Freshfields Bruckhaus Deringer US LLP, New York, NY; Elizabeth Anne Snodgrass, Luke Sobota, Three Crowns (US) LLP, Washington, DC, *for Appellants–Cross-Appellees*.

CECILIA F. MOSS (Peter R. Chaffetz, Andreas A. Frischknecht, Joshua D. Anders, David M. Berman, *on the brief*), Chaffetz Lindsey, LLP, New York, NY, *for Appellee–Cross-Appellant*.

Peter B. Rutledge, Law Office of Peter B. Rutledge, Athens, GA; Steven P. Lehotsky, Jonathan Urick, U.S. Chamber Litigation Center, Washington, DC; Peter Toldsorf, Erica Klenicki, Manufacturers' Center for Legal Action, Washington, DC, *for* Amici Curiae *the Chamber of Commerce of the United States of America, National Trade Council, and National Association of Manufacturers*.

Richard D. Deutsch, Andrew G. McBride, McGuireWoods LLP, Houston, TX, Washington, DC; Ben Norris, American Petroleum Institute, Washington, DC, *for* Amicus Curiae *American Petroleum Institute*.

Alexander A. Yanos, Carlos Ramos-Mrosovksy, Raja Rana, Hanna Robbins, Alston & Bird LLP, New York, NY, *for* Amici Curiae *Chief Mike A.A. Ozekhome, Professor Ikponmwonsa O. Omoruyi, Professor Offornze D. Amucheazi*.

Lauren A. Mandell, Apoorva J. Patel, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, *for* Amicus Curiae *Professor George A. Bermann*.

Peter A. Sullivan, Christina G. Hioureas, Foley Hoag LLP, New York, NY, *for* Amicus Curiae *the Nigerian Federal Ministry of Justice*.

Mallory B. Silberman, R. Stanton Jones, Sally L. Pei, Janine M. Lopez, Arnold & Porter Kaye LLP, Washington, DC, *for* Amici Curiae *Federal Inland Revenue Service, Federal Ministry of Finance, Budget, and National Planning of the Federal Republic of Nigeria*.

————————

CARNEY, *Circuit Judge*:

Esso Exploration and Production Nigeria Limited, the Nigerian subsidiary of an international oil corporation, has asked federal courts in the United States to enforce an arbitral award of $1.8 billion, plus interest, against the Nigerian National Petroleum Corporation ("NNPC") that Nigerian courts have partially set aside. The underlying dispute relates to an agreement between Esso and NNPC regarding oil production at the Nigerian-governed Erha oil field on the Gulf of Guinea. Since 1993, Nigeria has allowed Esso to develop Erha and extract its oil for profit; in return, NNPC became contractually entitled to obtain (or "lift") portions of the extracted oil. NNPC uses this lifted oil first to satisfy Esso's statutory tax obligations and royalties owed to the Nigerian government, and then to serve as its own share in the operation's profit. In 2007, less than two years after Esso began production at Erha, NNPC began lifting more oil than Esso believed it was entitled to extract.

Esso took its grievances to an arbitral panel—convened in Nigeria pursuant to its contract with NNPC—which found that NNPC had taken more oil than it was allowed and entered an award of almost $1.8 billion, plus interest, in Esso's favor (the "Award"). NNPC challenged the Award in Nigerian courts. Ultimately, in two separate judgments, the Nigerian Court of Appeal set aside part of the Award as arising from an inarbitrable tax dispute, concluding that it must instead be decided by a Nigerian tax tribunal. While multiple appeals remained pending in Nigerian fora, Esso petitioned the U.S. District Court for the Southern District of New York to enforce the entire Award against NNPC under the New York Convention. *See* 9 U.S.C. § 207.

The New York Convention generally obligates signatory states to enforce an award made by an arbitral panel in another signatory state, referred to as the "primary jurisdiction." It establishes an exception to the enforcement obligation, however, for awards that have been set aside by a court in the primary jurisdiction. In that

4

circumstance, a court considering a petition for enforcement may—but is not required to—enforce the award.

In this Circuit, the district court may exercise its discretion to enforce a set-aside award only where the primary jurisdiction's judgment vacating the award is "repugnant to fundamental notions of what is decent and just" in the United States, a standard that we have cautioned is "high, and infrequently met." *Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. v. Pemex-Exploración y Producción*, 832 F.3d 92, 106 (2d Cir. 2016) ("*Pemex*") (internal quotation marks omitted). Otherwise, the district court is obligated to afford comity to the foreign court's judgment and must decline to enforce the arbitral award that the foreign court set aside.

Here, in addition to opposing Esso's enforcement petition on its merits, NNPC urged the district court to dismiss the petition for want of personal jurisdiction over NNPC and on the ground of *forum non conveniens*. The district court rejected these threshold arguments but ultimately denied Esso's enforcement petition on the merits. After comparing the circumstances presented in *Pemex* to those found here, the district court concluded that, unlike the primary jurisdiction's judgment setting aside the contested award in *Pemex*, the Nigerian court's judgments here are owed comity.

Esso appealed the district court's merits judgment and NNPC cross-appealed its threshold determinations. Looking first at the cross-appeal, we agree with the district court's rulings on both personal jurisdiction and *forum non conveniens*, identifying no error in either the court's well-supported factual determinations or its legal conclusions. On the merits, we determine that the district court's analysis hewed more closely than it should have to the particular considerations at play in *Pemex*. Nonetheless, based on the record presented here, we agree with the district court's conclusion that comity should be extended to the judgments of the Nigerian Court of Appeal. But the district court

5

overshot the limits of its conclusion by denying Esso's petition in full: it should have enforced the portions of the Award that the Nigerian judgments left intact.

We therefore affirm the district court's judgment insofar as it denied NNPC's motion to dismiss for lack of personal jurisdiction or on *forum non conveniens* grounds. We further affirm the judgment to the extent that it denied Esso's petition to enforce the whole of the Award, but we vacate the judgment as to those parts of the Award that were not struck by the Nigerian judgments. As to the latter, we remand this case to the district court so that it may first determine precisely which aspects of the Award are enforceable under the Nigerian judgments, and then enter a partial enforcement order based on that determination.

The judgment of the district court is AFFIRMED IN PART and VACATED IN PART, and the case is REMANDED for further proceedings.

## BACKGROUND

### I. The New York Convention

The New York Convention, which governs enforcement of foreign arbitral awards, serves the goals of encouraging and standardizing "the recognition and enforcement of commercial arbitration agreements in international contracts" in signatory states. *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 520 n.15 (1974); *see* Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 ("N.Y. Convention").[2] As a signatory state, the United States has implemented the New York Convention under the express provisions

---

[2] *Pemex* and other decisions on which we rely arise in the context of a later-enacted treaty known as the Panama Convention. *See* 9 U.S.C. §§ 301–307. It has long been established, and is not questioned here, that the Panama Convention is substantively identical to the New York Convention and that authority interpreting one may be applied to the other. *Pemex*, 832 F.3d at 105 & n.9; *see Productos Mercantiles e Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 44–45 (2d Cir. 1994).

of chapter 2 of the Federal Arbitration Act ("FAA"). *See* 9 U.S.C. § 201 (providing that the New York Convention "shall be enforced in United States courts in accordance with [other provisions of the FAA]").

Under the New York Convention, the country in which an arbitral award is rendered "is said to have *primary* jurisdiction over the arbitration award." *CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 71 (2017) (quoting *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 500 F.3d 111, 115 n.1 (2d Cir. 2007)). The state with primary jurisdiction is "free to set aside or modify an award in accordance with its domestic arbitral law and its full panoply of express and implied grounds for relief." *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (citing N.Y. Convention art. V(1)(e)). All other signatory states are "secondary jurisdictions," and these states may decide only whether to enforce the arbitral award. *CBF Indústria*, 850 F.3d at 71 (emphasis omitted). In essence, the Convention allows for "a single-step process for reducing a foreign arbitral award to a domestic judgment." *Id.* at 72 (internal quotation marks omitted). This process occurs in "a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." *Id.* at 73 (quoting *Toys "R" Us*, 126 F.3d at 23).

The New York Convention "evince[s] a pro-enforcement bias" by obligating courts in a secondary jurisdiction to enforce a foreign arbitral award, subject only to limited exceptions. *Pemex*, 832 F.3d at 105–06 (internal quotation marks omitted); *see* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention."[3]). Article V of the Convention sets out the limited circumstances in which

---

[3] As this Court has explained, "the term 'confirm' as used in Section 207 [of the FAA] is the equivalent of 'recognition and enforcement' as used in the New York Convention." *CBF Indústria*, 850 F.3d at 72 (footnote omitted); *see also id.* at 75 ("[T]he proper term for the single-

a court is not bound to enforce an award. As relevant here, a court sitting in secondary jurisdiction may refuse to confirm an arbitral award at the request of the party against whom enforcement is sought where the award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." N.Y. Convention art. V(1)(e). The party opposing enforcement bears the heavy burden of showing that an exception to mandatory enforcement applies. *See id.* art. V(1); *Zeiler v. Deitsch*, 500 F.3d 157, 164 (2d Cir. 2007).

As a general matter, "the plain text of the [New York] Convention seems to contemplate the unfettered discretion of a district court to enforce an arbitral award annulled in the awarding jurisdiction." *Pemex*, 832 F.3d at 106. In practice, however, our Circuit has treated a primary jurisdiction's decision to set aside an arbitral award as conclusive, binding the U.S. court from which enforcement is sought. This practice is dictated by the principle of international comity, under which courts of one sovereign nation "ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries." *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997). Honoring this principle, we have cautioned that district courts generally should decline to enforce an award that has been set aside in the primary jurisdiction unless the judgment that set it aside is "repugnant" to U.S. public policy. *Pemex*, 832 F.3d at 106; *see also id.* ("[A] final judgment obtained through sound procedures in a foreign country is generally conclusive unless enforcement of the judgment would offend the public policy of the state in which enforcement is sought." (internal quotation marks, ellipses, and emphasis omitted)).

---

step process in which a federal district court engages when it sits in secondary jurisdiction over a foreign arbitral award is '[e]nforcement[.]'").

## II. Factual and procedural background

### A. Erha oil production

For nearly three decades now, NNPC and Esso—a wholly owned Nigerian subsidiary of Exxon Mobil Corporation[4]—have partnered in a petroleum exploration and oil extraction venture in the Erha oil field, located offshore in the Niger Delta and governed by Nigeria. In 1990, Nigeria began to solicit bids from international oil companies, seeking a partner in the development of its deep offshore oil fields. Exxon bid on Erha and aggressively negotiated the project terms with the Nigerian government and NNPC, leading Esso and NNPC in 1993 to enter into the Production Sharing Contract ("PSC"), the document that governs the parties' relationship in the venture.

The PSC obligates Esso to "provide funds and bear the risk of" development and extraction at Erha. App. 418. Under the PSC, any oil extracted from Erha is divided, conceptually, into four tranches: (1) tax oil, to cover the taxes owed by Esso under the Nigerian Petroleum Profits Tax ("PPT") Act; (2) royalty oil, to cover royalty payments owed to the Nigerian government; (3) cost oil, to cover operating costs, which Esso alone bears; and (4) profit oil, which includes all remaining oil and is split between Esso and NNPC. Consistent with the tax oil allocation, Esso must calculate its tax liability for the Erha operation and prepare tax returns in accordance with the PPT Act. NNPC then transmits the returns to the Nigerian government. NNPC is responsible for lifting (i.e., taking and transporting) the tax oil and royalty oil for delivery to the government. Of

---

[4] Esso assigned some of its rights under the contract with NNPC to Shell Nigeria Exploration and Production Company Limited ("SNEPC"), and accordingly, SNEPC is also a named petitioner-appellant–cross-appellee in this case. Esso's and SNEPC's distinct corporate identities are not relevant for purposes of this appeal, however, and so we refer only to Esso in our discussion. We note, however, that some of the rights and obligations discussed in this Opinion apply to SNEPC as well as to Esso.

9

particular import here, the PSC also provides that any "dispute . . . concerning the interpretation or performance" of the contract may be subject to binding arbitration, and that any such arbitration must be conducted in Nigeria under Nigerian law. App. 446.

After spending more than 13 years and several billion dollars developing Erha, Esso began extraction in 2006. By late 2007, the parties had become embroiled in a dispute over the oil allocations, each accusing the other of overestimating or underestimating the amount properly allocable to each tranche. Over Esso's objections, NNPC began to lift more tax and royalty oil than Esso had allocated, apparently (as alleged by Esso) for the purpose of implementing a new Nigerian government "policy directive to capture additional 'revenue opportunities' from the PSC," in response to changing oil prices. Esso Br. at 12. In addition, instead of transmitting the tax returns that Esso had prepared as contemplated by the PSC, NNPC prepared and delivered to the government its own returns, in which it calculated a higher tax liability for Esso. In response, Esso commenced arbitration in July 2009.

## B. The Nigerian arbitration and court actions

In October 2011, an arbitral panel convened under the PSC awarded Esso nearly $1.8 billion plus interest based on its finding that, beginning in December 2007, NNPC had overlifted tax and royalty oil and improperly reduced the cost oil owed to Esso.[5] In so doing, the panel rejected NNPC's argument that the panel lacked jurisdiction over the dispute because it concerned only the amount of taxes owed under Nigerian law,

---

[5] In accordance with the PSC, the arbitral panel included three individuals: Charles N. Brower, a U.S. national and a U.S.-appointed judge on the Iran–United States Claims Tribunal, named by Esso; Professor Paul Obo Idornigie, a Nigerian national and professor of law at the Nigerian Institute of Advanced Legal Studies, named by NNPC; and L. Yves Fortier, the former Canadian ambassador to the United Nations, named jointly by Judge Brower and Professor Idornigie to serve as president of the panel.

which NNPC urged was inarbitrable. The panel concluded instead that the dispute was wholly contractual in nature—as well as "triable civilly" and "capable of being compromised by way of accord and satisfaction"—and therefore arbitrable under the terms of the PSC.[6] App. 258.

Before the panel issued the Award, Nigeria's tax authority, the Federal Inland Revenue Service ("FIRS"), initiated an action in Nigerian trial court seeking to enjoin the arbitration. In March 2012, the trial court decided—contrary to the arbitral panel's determination—that the entire dispute was inarbitrable. The court emphasized that "any determination of the issues raised" would necessarily affect FIRS's ability to assess and collect taxes and would "adversely affect the revenue" that had accrued or would accrue to the Nigerian government.[7] App. 521. Concurrently with the FIRS action and after the arbitral panel issued the Award, NNPC moved the Nigerian trial court to set the Award aside. In May 2012, the trial court granted NNPC's request and nullified the entire Award on the ground that it was improperly granted, again concluding that the dispute involved inarbitrable tax issues. Esso appealed both trial court decisions.

In July 2016, the Nigerian Court of Appeal affirmed in part and reversed in part the trial court's ruling in NNPC's set-aside action. It agreed that the arbitral panel did not have jurisdiction over issues relating to the proper calculation of Esso's tax liability (and therefore any part of the dispute concerning overlifted tax oil), but it found those tax issues severable from any claims grounded strictly in the PSC. As a result, it reinstated the Award insofar as the arbitrators had found NNPC liable on the severable

---

[6] Professor Idornigie dissented from the Award, concluding that the dispute was inarbitrable because, "although th[e] Arbitral Tribunal ha[d] the jurisdiction to interpret the provisions of the PSC and relevant tax legislation," it lacked jurisdiction to resolve disputes "connected with or pertaining to the taxation of companies." App. 366, 410.

[7] The trial court's decision in FIRS's favor resulted in only declaratory relief because the arbitration had concluded and so there was no longer a proceeding to enjoin.

contract-based issues—principally, the preparation of tax returns and calculation of lifting allocations.

Less than a year later, the Nigerian Court of Appeal similarly affirmed in part and reversed in part the trial court's ruling in the FIRS action. It reached substantially the same result as it had in the first appeal, with a twist: whereas the first appeal decision characterized the arbitrated dispute as fundamentally tax-related but containing certain severable contract-based claims, the FIRS appeal decision determined that the dispute was "basically contractual in nature," containing only three tax-related claims that lay outside the arbitral panel's jurisdiction. App. 749–51. It thus reaffirmed the set-aside of the Award as to the tax-related claims and attendant damages but did not purport to disturb what remained. Appeals from these two Court of Appeal judgments remain pending before the Supreme Court of Nigeria as of this writing, so far as this panel has been advised.

Separate from the set-aside action and the FIRS action described above, Esso initiated two additional proceedings. First, Esso brought a direct action against NNPC in Nigerian trial court on the same substantive claims as were adjudicated in the arbitration, apparently to preserve its claims in the event that the Award was set aside after the applicable statute of limitations had run. In April 2016, the trial court dismissed the substantive action as an abuse of process, concluding that it was improperly duplicative of NNPC's set-aside action. Esso's appeal in that case appears still to be pending. Second, Esso filed an action in Nigeria's specialized tax tribunal, in which it disputes FIRS's tax assessments under the PPT Act.[8] To our knowledge, this tax action also remains unresolved.

---

[8] The record is unclear as to whether, in the tax tribunal, Esso is seeking a refund from Nigeria for the tax oil allegedly overlifted by NNPC.

### C. U.S. district court action

Esso commenced this action in the district court in 2014, before expiration of the three-year statute of limitations established by the FAA. *See* 9 U.S.C. § 207. It asked the district court to enforce the Award pursuant to the New York Convention.[9] NNPC responded by moving to dismiss Esso's petition for lack of personal jurisdiction or based on *forum non conveniens*. NNPC also asked the district court to dismiss Esso's petition on the merits, citing the Nigerian courts' decisions nullifying the Award. As described above, after due consideration, the district court rejected NNPC's personal jurisdiction and *forum non conveniens* arguments, but granted its request to deny Esso's petition to enforce the Award.[10]

As to personal jurisdiction, the parties agreed that NNPC was properly served and that the Foreign Sovereign Immunities Act ("FSIA") provided the statutory basis for personal jurisdiction over NNPC. *See Esso Expl. and Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 332–33 (S.D.N.Y. 2019). The FSIA provides that "[p]ersonal jurisdiction over a foreign state," including "an agency or instrumentality of a foreign state," exists "as to every claim for relief over which the district courts have subject matter jurisdiction . . . where service has been made." 28 U.S.C. §§ 1330(b), 1603(a). NNPC conceded that it is an instrumentality of Nigeria. The only questions before the district court, therefore, were whether NNPC was entitled to

---

[9] The applicability of the New York Convention is not in dispute here, where the Award was rendered in the signatory state of Nigeria, under Nigerian law, and involves parties that are not citizens of the United States. *See* N.Y. Convention art. I(1); 9 U.S.C. § 202.

[10] The district court framed its denial of Esso's petition for enforcement as a grant of NNPC's motion to dismiss under Rule 12(b)(6). As we discuss further below, the determination of a petition to enforce an arbitral award under the New York Convention is a summary proceeding and is not properly evaluated under ordinary Rule 12(b)(6) pleading standards.

constitutional due process and, if so, whether those due process requirements had been satisfied.

In addressing these questions, the court first engaged in a thorough analysis of the relationship between NNPC and the Nigerian government according to the factors set forth in *EM Ltd. v. Banco Central de la República Argentina*, 800 F.3d 78, 90–91 (2d Cir. 2015). Based on its extensive factual findings, the court concluded that NNPC is an alter ego of Nigeria and thus Esso need not establish that NNPC has the minimum contacts with the United States ordinarily required to ensure due process. The court went on to determine that, even if NNPC were not an alter ego of Nigeria, constitutional due process requirements were met for the independent reason that NNPC had sufficient contacts with the United States to support the court's exercise of specific jurisdiction over it and that the exercise of jurisdiction would be reasonable under the circumstances.

As to *forum non conveniens*, the district court conducted the three-step analysis established in *Iragorri v. United Technologies Corp.*, 274 F.3d 65 (2d Cir. 2001) (en banc), and concluded, in its discretion, that the *Iragorri* factors favored Esso's choice of forum. In reaching that conclusion, the district court determined that, although the courts of Nigeria would generally provide an adequate alternative forum, it owed deference to Esso's choice of forum, and both private and public interests weighed in favor of the district court in New York sitting as a secondary jurisdiction under the New York Convention.

On the merits, the district court emphasized that the parties did "not dispute that the Award ha[d] been set aside in Nigeria" and that the decision whether to enforce the Award was therefore committed to its discretion. *Esso*, 397 F. Supp. 3d at 349–50. In then evaluating whether the Nigerian Court of Appeal's judgments partially setting aside the Award "offend[] notions of justice" in the United States, the district court

14

looked to the considerations identified by the *Pemex* court: "(1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum; and (4) the prohibition against government expropriation without compensation." *Id.* at 351 (quoting *Pemex*, 832 F.3d at 107). The district court concluded that, although it was a "close call" because the Nigerian court's rulings were "seemingly anomalous," the four *Pemex* considerations overall favored extending comity to the Nigerian judgments partially setting aside the Award. *Id.* at 354.

After a brief analysis, the district court also rejected Esso's assertion that it would not receive due process in Nigeria because of litigation delays and difficulties it may face in collecting damages from a state entity in Nigeria even if the Nigerian courts ultimately rule in Esso's favor. The court reasoned that Esso's prediction of "a lengthy appeals process" in Nigeria provided an insufficient basis for denying comity to these foreign judgments. *Id.* at 355. And it dismissed as "meritless" Esso's contention that it would have difficulty collecting on a Nigerian judgment in its favor, explaining that Esso (which entered into the PSC with a Nigerian corporation subject to Nigerian law, of its own accord) is "free to convert" a future Nigerian judgment to a U.S. judgment. *Id.*

Following these determinations, the district court denied in full Esso's petition to enforce the Award.

## DISCUSSION

We first consider our jurisdiction to adjudicate NNPC's cross-appeal of the district court's rulings against it on its motion to dismiss for want of personal jurisdiction and for *forum non conveniens*, notwithstanding that NNPC prevailed on the merits. We find that, in light of our partial vacatur and the risk to NNPC of an adverse ruling on remand, NNPC has standing to press its cross-appeal, and our jurisdiction to adjudicate those issues is thus secure. Turning to the substance of NNPC's challenges,

15

we identify no error in the district court's meticulous factual determinations or in its sound legal analysis of the two issues NNPC presses. We therefore affirm its denial of NNPC's motion to dismiss.

We then turn to the district court's merits ruling, which relied heavily on our decision in *Pemex*. We clarify that the four considerations identified in that case are not exhaustive, nor is review of them required in every instance in which a court must decide the critical question: whether a foreign judgment setting aside an arbitral award offends "fundamental notions of what is decent and just in the United States." *Pemex*, 832 F.3d at 107 (internal quotation marks omitted). Our clarification mandates a more expansive analysis than the district court conducted. Having undertaken such an analysis, we—like the district court—conclude that the answer to that critical question here is "no." Based on the record before us, the judgments entered by the Nigerian Court of Appeal are not repugnant to fundamental notions of justice and, accordingly, U.S. courts owe those judgments comity in this case.

At the same time, we conclude that the district court went too far by refusing to enforce not only those parts of the Award that the Nigerian Court of Appeal set aside but also those parts that it reinstated based on its decision that they did not arise from a tax dispute. We therefore remand the case to the district court so that, with the aid of the parties, it may delineate the effects of the Nigerian judgments and on that basis formulate a partial enforcement order.

# I. NNPC's cross-appeal: Personal jurisdiction and *forum non conveniens*

## A. NNPC's standing to press an appeal

Although NNPC prevailed on the merits in the district court, it has filed a cross-appeal in which it challenges the court's threshold determinations that the court had personal jurisdiction over NNPC and that *forum non conveniens* did not compel dismissal. We turn first to examining whether NNPC has Article III standing to

16

challenge those aspects of the district court's decision, because, if not, we would lack jurisdiction over the cross-appeal.

To establish standing to challenge a district court ruling, "a party must be aggrieved by the judicial action." *Great Am. Audio Corp. v. Metacom, Inc.*, 938 F.2d 16, 19 (2d Cir. 1991). In some cases, "a party who has prevailed on the merits may appeal from an adverse ruling collateral to the judgment on the merits so long as that party retains a stake in the appeal satisfying the requirements of Art. III." *Tr. for Certificate Holders of the Merrill Lynch Mortg. Invs., Inc. Mortg. Pass-Through Certificates, Series 1999-C1, ex rel. Orix Capital Mkts., LLC v. Love Funding Corp.*, 496 F.3d 171, 173 (2d Cir. 2007) (per curiam) (internal quotation marks and ellipsis omitted); *see ACLU v. Dep't of Justice*, 894 F.3d 490, 494 (2d Cir. 2018) (explaining that a prevailing party may have appellate standing when it is aggrieved "by some aspect of the trial court's judgment or decree" (internal quotation marks omitted)).

We have treated at least one cross-appeal by a prevailing party as viable when a decision of the appeal "revive[d] the action against the appellees." *Parker v. Columbia Pictures Indus., Inc.*, 204 F.3d 326, 341 n.7 (2d Cir. 2000) (Sotomayor, *J.*). *Cf. Allstate Ins. Co. v. A.A. McNamara & Sons, Inc.*, 1 F.3d 133, 134 (2d Cir. 1993) (dismissing prevailing party's cross-appeal for lack of standing where judgment in that party's favor was affirmed). In such circumstances, the realization of the risk that the party otherwise prevailing "might become aggrieved upon reversal on the direct appeal" suffices to establish standing. *Love Funding*, 496 F.3d at 174 (internal quotation marks omitted).

Applying that approach here, we find that NNPC has established standing as to its cross-appeal. Our ruling on the merits revives Esso's petition against NNPC (albeit only in part) and risks an adverse judgment for NNPC on remand. If the district court was incorrect about either the personal jurisdiction or *forum non conveniens* arguments advanced below by NNPC, a ruling in NNPC's favor on cross-appeal could eliminate

that risk. NNPC therefore has a sufficient stake in these threshold determinations to establish standing for its cross-appeal.[11]

Because NNPC's arguments on cross-appeal concern whether the district court erred in entertaining this dispute more generally, we address those arguments before turning to the merits of Esso's appeal.

### B. Personal jurisdiction

When considering a district court's ruling on personal jurisdiction, "we review its factual findings for clear error and its legal conclusions *de novo.*" *Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 395 (2d Cir. 2009). In general, three requirements must be satisfied before a district court may lawfully exercise personal jurisdiction over a party: (1) "the plaintiff's service of process upon the defendant must have been procedurally proper"; (2) "there must be a statutory basis for personal jurisdiction that renders such service of process effective"; and (3) "the exercise of personal jurisdiction must comport with constitutional due process principles." *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 (2d Cir. 2016) (internal quotation marks omitted). To assess whether the exercise of personal jurisdiction comports with due process, the court must ordinarily determine whether the defendant has minimum contacts with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Frontera*, 582 F.3d at 396 (internal quotation marks omitted); *see Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945). Where, however, the defendant is an alter ego of a foreign state, it is not "entitled to rights under the Due Process Clause" and so personal jurisdiction may be obtained by satisfying the first two requirements alone. *Frontera*, 582 F.3d at 400; *see Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 55 (2d Cir. 2021).

---

[11] We do not consider or decide whether NNPC would have standing to appeal on these threshold issues if we were to affirm in full the district court's ruling on the merits.

An alter ego relationship is not easy to establish, as "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." *Gater Assets*, 2 F.4th at 55 (quoting *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 627 (1983)). This presumption may be overcome only where the instrumentality "is so extensively controlled by [the state] that a relationship of principal and agent is created" or where affording the entity "separate juridical status 'would work fraud or injustice.'" *Id.* (quoting *First Nat'l City Bank,* 462 U.S. at 629); *accord EM Ltd.*, 800 F.3d at 90.

As stated, the parties here agree that NNPC was properly served and that the FSIA provides the statutory basis for personal jurisdiction over NNPC as an "instrumentality" of Nigeria. *See* 28 U.S.C. §§ 1330(b), 1603(a). The questions at issue are whether NNPC is an alter ego of Nigeria and, if it is not, whether the due process requirement of "minimum contacts" has been met.

To answer the first question—whether NNPC is an alter ego of Nigeria—the district court engaged in an exhaustive factual analysis that was based on the parties' extensive jurisdictional discovery. *See Esso*, 397 F. Supp. 3d at 333–40. The district court looked to the factors that we have advised are relevant to the "touchstone inquiry for 'extensive control'" creating alter-ego status: whether the state "(1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state." *EM Ltd.*, 800 F.3d at 91. The analysis here established that "Nigeria has a substantial role in the day-to-day operations of

19

NNPC," *Esso*, 397 F. Supp. 3d at 338, as evidenced by several aspects of state control that are reflected in the record. Among these, as the district court observed, are that

- the Nigerian statute creating NNPC requires it to "engag[e] in activities that would enhance the petroleum industry in the overall interest of Nigeria," *id.* at 336 (emphasis omitted) (quoting Atake Decl. Ex. 10, App. 880);

- Nigeria is NNPC's sole shareholder;

- the Nigerian president appoints—and historically has also personally served as—the country's Minister of Petroleum Resources, a position that also ex officio chairs NNPC's board;

- the Nigerian president holds appointment and removal power over all of NNPC's board members and senior executives; and

- the Nigerian president has the duty and authority to review and approve NNPC's budget and expenses, including expenses that benefit Nigeria rather than NNPC, and he may do so with or without NNPC board approval.

As one relevant example of the effects of Nigeria's close control of NNPC, the record shows that in 2008, then-President Umaru Musa Yar'Adua at least influenced, and may have directly ordered, NNPC's overlifting of oil from Erha.

In a lengthy and careful review of the record, the district court also found "ample evidence that Nigeria uses NNPC's 'property as its own.'" *Id.* at 338 (quoting *EM Ltd.*, 800 F.3d at 91). It highlighted that the Ministry of Petroleum Resources maintains offices on property belonging to NNPC while paying no rent and that NNPC donated to the government certain highly valuable equipment that its board had, in contrast, recommended selling for financial benefit. No less significant, the district court detailed

20

how at least three bank accounts are shared by Nigeria and NNPC, rejecting NNPC's contentions to the contrary.

We identify no error, much less clear error, in these findings. Because they demonstrate extensive control of NNPC by the state, the district court rightly concluded that NNPC is an alter ego of Nigeria and thus is not entitled to wage a due process challenge to the district court's exercise of personal jurisdiction over it.[12] We affirm the court's ruling that it had personal jurisdiction over NNPC.

## C. *Forum non conveniens*

We review a district court's ruling on a *forum non conveniens* question for abuse of discretion. *Figueiredo Ferraz e Engenharia de Projeto Ltda. v. Republic of Peru*, 665 F.3d 384, 389 (2d Cir. 2011). Reversal is warranted only where the district court's decision rests on an error of law or clearly erroneous factual finding, where its decision otherwise cannot be located within the range of permissible decisions, or where the district court has failed to consider all relevant factors or has unreasonably weighed those factors. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005). In our Circuit, a district court's exercise of its discretion on a *forum non conveniens* motion is guided by

---

[12] The district court went on to determine in addition that its exercise of jurisdiction comported with due process in any event, because NNPC had "certain minimum contacts with" the United States and that "the exercise of jurisdiction [was] reasonable in the circumstances." *Esso*, 397 F. Supp. 3d at 340 (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018)); *see id.* at 346–47. Its factual findings on this issue were equally extensive. In sum, it determined that NNPC marketed, solicited, and negotiated the PSC (the agreement governing its relationship with Esso) through communications in and directed to the United States, thereby "purposely avail[ing] itself of the forum." *Id.* at 344. It also pointed to record evidence reflecting that NNPC transacts business in U.S. dollars and has repeatedly received and transferred funds related to Erha through U.S. bank accounts. Finally, it determined that to exercise jurisdiction in this case would not be "unreasonable." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 173 (2d Cir. 2013) (internal quotation marks omitted). In particular, it persuasively explained that this summary proceeding placed only a "limited" burden on NNPC and that Esso had a substantial interest in using this forum to obtain relief, and in doing so efficiently. *Esso*, 397 F. Supp. 3d at 346–47.

the three-step process that we set forth in *Iragorri*: first, the court "determines the degree of deference properly accorded the plaintiff's choice of forum"; second, it assesses the adequacy of the defendant's proposed alternative forum; and third, it weighs the private and public interests implicated in the choice of forum. *Id.* (citing *Iragorri*, 274 F.3d at 73–74).

Here, at the first step, the district court appropriately concluded that Esso's choice of forum in the United States was owed deference, albeit somewhat less deference than if Esso had chosen to bring this action in Nigeria, where all parties are incorporated. The court then determined that the result of its second-step inquiry into the adequacy of Nigeria—NNPC's preferred forum—was a wash. It found that, although Nigeria could be an adequate forum, the record raised at least some question (for the reasons detailed in the merits determination) whether Nigerian courts would provide Esso with an adequate remedy. *See Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 189 (2d Cir. 2009) (explaining that a forum may "be inadequate if it . . . provides a remedy so clearly unsatisfactory or inadequate that it is tantamount to no remedy at all").

At the third and final step, the district court concluded that both the private and public interest factors weighed in favor of denying NNPC's motion. The private interest factors include logistical considerations of convenience, such as the ease of access to sources of evidence; these favored Esso in light of the summary nature of a proceeding to confirm an arbitral award. The public interest factors include (1) the risk of court congestion in the chosen forum, (2) the local interest in having a localized controversy decided at home, (3) the familiarity of the forum with the law governing the dispute, (4) the desire to avoid unnecessary conflict-of-law or foreign law issues, and (5) the fairness to the citizens in the forum who are burdened with serving on a jury. *See Iragorri*, 274 F.3d at 74. Only the second (regarding the local interest) favored NNPC, in the district court's assessment; on balance, it concluded, the four other public interest

factors weighed in favor of Esso's chosen forum and, in sum, the calculus favored Esso's choice.

NNPC makes no persuasive argument identifying error in the factual or legal components of the district court's discretionary decision. We thus affirm its decision to allow the action to proceed in the United States.

## II. Esso's appeal: Enforcement of the Award

We turn now to Esso's appeal from the district court's merits judgment declining to enforce the Award in light of the Nigerian judgments partially setting it aside. First, we clarify that the standard set forth in *Pemex* for evaluating a petition to enforce an arbitral award that has been annulled in the primary jurisdiction is, simply, whether the foreign judgment setting aside the award is, in the operative phrase, "repugnant to fundamental notions of what is decent and just" in the United States. 832 F.3d at 97 (internal quotation marks omitted). In applying this standard, district courts are not limited to the four considerations discussed in *Pemex*, which led the *Pemex* court to enforce the award at issue there, notwithstanding the award's annulment in the primary jurisdiction. Rather, district courts may, and should, consider other factors relevant to the circumstances of a particular case in determining whether a party's showing meets this stringent standard and, as a result, a judgment of the primary jurisdiction can appropriately be deprived of comity.

Taking this more expansive approach, we next determine that the Nigerian judgments setting aside part of the Award won by Esso are owed comity. As a result, we hold that the portions of the Award that the Nigerian Court of Appeal set aside are not enforceable in U.S. courts, but the portions Award that the Nigerian court reinstated are enforceable in U.S. courts. Because the district court erred in failing to delineate and enforce the reinstated portions of the Award, we remand to permit further proceedings consistent with this decision.

## A. Legal standards

### 1. *Standard of review*

Before we go further, the posture of the underlying proceeding warrants clarification. Following the parties' lead, the district court framed its merits decision against enforcement of the Award as a "grant[]" of a motion to dismiss filed by NNPC under Federal Rule of Civil Procedure 12(b)(6).[13] *Esso*, 397 F. Supp. 3d at 355. Esso seizes on this framing and urges on appeal that we must assume the truth of the "allegations" in its petition for enforcement and draw all reasonable inferences in its favor.

But a petition to enforce an arbitral award under the New York Convention is adjudicated in a summary proceeding in which the standards governing Rule 12(b)(6) motions are simply not applicable. *Cf. ISC Holding AG v. Nobel Biocare Fin. AG*, 688 F.3d 98, 112 (2d Cir. 2012) ("Rule 12(b)'s pleading requirements [do] not apply to a petition to modify and then confirm an arbitration award." (citing *Productos Mercantiles E Industriales, S.A. v. Faberge USA, Inc.*, 23 F.3d 41, 46 (2d Cir. 1994))); *see also TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 940 (D.C. Cir. 2007) (rejecting the argument that Rule 12(b)(6) standards govern an action to enforce a foreign arbitral award). Esso does not identify any authority suggesting otherwise. Regardless of how NNPC styled its submission responding to Esso's petition for enforcement, it is appropriately construed as a merits opposition to the petition rather than a Rule 12(b)(6) motion.[14]

---

[13] We note, however, that the Rule 12(b)(6) framing does not appear to have improperly affected the district court's conduct or analysis, and it appropriately issued a ruling based on the entire record before it.

[14] Notwithstanding the label it gave its own motion below, on appeal NNPC appears to recognize the error we discuss here because it opposes Esso's suggestion that we view the petition as containing "allegations" to which Rule 12(b)(6) pleading standards apply and argues that "the way NNPC styled its motion has no bearing on whether the District Court's dismissal . . . was proper." NNPC Br. at 28–29. Indeed, as NNPC points out, the submission of

On appeal, we review a district court's decision to extend or deny comity to a foreign judgment for abuse of discretion. *Pemex*, 832 F.3d at 100. We review its underlying legal conclusions *de novo* and findings of fact for clear error. *CBF Indústria*, 850 F.3d at 70. A district court abuses its discretion when it relies on an error of law (for example, by applying the wrong legal principle) or clear error of fact, or when its decision cannot otherwise be located within the range of permissible decisions. *Thai-Lao Lignite (Thailand) Co. v. Gov't of Lao People's Democratic Republic*, 864 F.3d 172, 181 (2d Cir. 2017).

### 2. *The enforceability standard after* Pemex

As summarized above, the New York Convention generally obligates U.S. courts sitting as a secondary jurisdiction to enforce arbitral awards rendered in a signatory state. Article V of the Convention lists seven exceptions to that obligation. If an exception applies, the secondary jurisdiction "may" choose not to enforce the award. One such exception exists when the award "has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made." N.Y. Convention art. V(1)(e). In *Pemex*, we clarified that the "set-aside" exception articulated in article V—although important—should not be understood as an invitation to a relaxed exercise of impressionistic discretion. Rather, the comity that U.S. courts owe to foreign judgments remains a vital prudential concern. *See Pemex*, 832 F.3d at 106.

In accordance with this concern, *Pemex* looked to the established standard in U.S. courts for declining to enforce foreign judgments and applied that standard to the context of petitions to enforce awards that have been set aside. *See generally*, *e.g.*, Restatement (Fourth) of the Foreign Relations Law of the United States § 484 (2018)

---

voluminous material by both parties beyond the pleadings suggests that the parties understood that the court was not adjudicating a typical Rule 12(b)(6) motion.

("[A] court in the United States need not recognize a judgment of a court of a foreign state if . . . the judgment or the claim on which the judgment is based is repugnant to the public policy of . . . the United States[.]"). The standard is a demanding one.

Accordingly, *Pemex* teaches that a district court should enforce an award that was set aside in the primary jurisdiction—and thereby deny comity to the relevant foreign judgment—only if the judgment setting aside the award can be properly characterized as "repugnant to fundamental notions of what is decent and just" in the United States, in which case reliance on the judgment would be contrary to U.S. public policy. 832 F.3d at 106 (quoting *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986)); *see also Thai-Lao*, 864 F.3d at 176 (explaining that *Pemex* "carved out a 'public policy' exception to the comity principle for occasions when enforcing [a set-aside award] is needed 'to vindicate "fundamental notions of what is decent and just" in the United States'" (quoting *Pemex*, 832 F.3d at 107)). This is the standard that courts in this Circuit are now bound to apply.

The *Pemex* decision went on to describe "four powerful considerations" that guided its application of this standard under the circumstances of that case. *Pemex*, 832 F.3d at 107 ("The high hurdle of the public policy exception is surmounted here by . . . (1) the vindication of contractual undertakings and the waiver of sovereign immunity; (2) the repugnancy of retroactive legislation that disrupts contractual expectations; (3) the need to ensure legal claims find a forum; and (4) the prohibition against government expropriation without compensation."). But those aspects of the *Pemex* analysis did not reduce the applicable standard to a four-factor formula that courts must—or necessarily even should—apply in every case involving set-aside arbitral awards. Rather, the prudential concern of international comity was "surmounted" in the circumstances presented in *Pemex* by four particular considerations that may or may not be relevant to other petitions seeking enforcement of a set-aside award. *Id.*

Although the relevant considerations will vary with the context of an enforcement petition, in no event should the *Pemex* standard be understood as easy to meet. On the contrary, we emphasized there that "[a]ny court should act with trepidation and reluctance in enforcing an arbitral award that has been declared a nullity by the courts having jurisdiction over the forum in which the award was rendered." *Id.* at 111. The public policy exception to the principle of comity "does not swallow the rule: the standard is high, and infrequently met." *Id.* at 106 (internal quotation marks and brackets omitted). To carefully balance "the goals of comity and res judicata" with "fairness to litigants," courts being asked to enforce a set-aside arbitral award must evaluate whether the judgment that set aside the award "tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property." *Id.* (quoting *Ackermann*, 788 F.2d at 841–42). In the absence of a clear adverse effect on these fundamental public policy concerns, comity stands firmly as our guiding value.

## B. Application of the *Pemex* enforceability standard

Esso has not carried its burden under *Pemex* of showing that the Nigerian judgments partially setting aside the Award clearly contravene U.S. public policy. We thus affirm the district court's discretionary decision to afford comity to the Nigerian Court of Appeal judgments and to decline to enforce the portions of the Award that those judgments set aside. We go no further than that, however: under the New York Convention, the district court was obligated to enforce the portions of the Award that the Nigerian Court of Appeal reinstated. We therefore vacate the district court's decision insofar as it failed to ascertain and enforce the surviving portions of the Award.

*1. The Nigerian judgments are entitled to comity*

We conclude that, on the present record, Esso has fallen short of its burden of showing that this is one of those rare cases presenting "extraordinary circumstances" that are repugnant to notions of justice in the United States. *Pemex*, 832 F.3d at 106 (internal quotation marks omitted). Although the district court interpreted the *Pemex* standard too narrowly by limiting its analysis substantially to the four factors considered there—not all of which are relevant to this case—we agree generally with its conclusion that the Nigerian court judgments are owed comity here.

Questions may reasonably be raised regarding the correctness of the Nigerian appellate court's legal conclusions, as well as the practical effect of its judgments, but our role in secondary jurisdiction is not to second-guess the Nigerian court's substantive determinations made under Nigerian law. We assess that court's rulings only so far as is required to ascertain whether they are plainly incompatible with U.S. notions of justice. *See, e.g.*, *Zeiler*, 500 F.3d at 169 ("Confirmation under the Convention is a summary proceeding in nature, which is not intended to involve complex factual determinations, other than a determination of the limited statutory conditions for confirmation or grounds for refusal to confirm.").

Unrestrained by the four factors identified in *Pemex*, we turn to the assertions that Esso presses here in support of its petition: that the Nigerian court proceedings were "fundamentally unfair" and denied Esso due process, and that those proceedings have caused Esso to suffer "injustices much like those inflicted on the petitioners in *Pemex*." Esso Br. at 47. Esso maintains that Nigerian courts have consistently denied it due process, arguing that those courts made results-oriented decisions designed to shield NNPC—and, by extension, the Nigerian government—from judgments awarding Esso damages for NNPC breaches.

In support, Esso submits first that the Nigerian trial court "ignored all of [its] arguments" in setting aside the Award. Petition ¶ 66, App. 143. But we are concerned with the Court of Appeal's later judgments, not the trial court's decisions. Esso does not—and cannot reasonably—contend that the Court of Appeal so baldly refused to consider its arguments in rendering decisions that partially reinstated the Award. Nor does Esso assert that it had an inadequate opportunity to be heard or endured some other glaring procedural defect before the Nigerian courts. Moreover, in contrast to the egregious retroactive application of new laws that occurred in *Pemex*, the Nigerian Court of Appeal's judgments relied on Nigerian laws that were enacted either before the parties began their contractual relationship or before this dispute arose.

Esso finds fault instead with the substance of the Court of Appeal's decisions, emphasizing that the court ruled against it in all the ways that matter, effectively denying Esso any remedy even as the court reinstated those portions of the Award that held NNPC liable for breach of the PSC. Bearing in mind that we must use a light touch when considering substantive determinations under the law of the primary jurisdiction, *see Pemex*, 832 F.3d at 111, we do not agree that the Nigerian judgments are so facially deficient in their substantive analysis that they merit no respect. Although the outcome settled on by the Nigerian Court of Appeal is undeniably favorable to NNPC (and thus to Nigeria), the court's opinions appear on their face to analyze the relevant issues rationally under Nigerian law. And the issues appear susceptible to reasonable disagreement: indeed, the Nigerian courts *did* disagree among themselves, with the Court of Appeal overturning the trial court's unnuanced finding that the dispute submitted to arbitration was entirely a tax dispute. Rather, the appellate decisions plausibly differentiated between the portions of the Award that addressed a tax dispute and the (reinstated) portions that it found addressed a contractual dispute. Our analysis may go no further: it is simply not this court's role to engage in a more probing analysis

29

of the substance of the Nigerian court's judgments. *See, e.g.*, *Pemex*, 832 F.3d at 108 ("[W]e are in no position to pass upon [the primary jurisdiction's] interpretation of [foreign] law, or upon the sufficiency of its precedent."); *id.* at 109 ("Whether the [foreign court] properly reasoned from [its] precedent is emphatically not for U.S. courts to say."); *Ackermann*, 788 F.2d at 837 ("[A] final judgment obtained through sound procedures in a foreign country is generally conclusive.").

It is true, still, that the Nigerian Court of Appeal judgments may leave important questions unanswered. Most significantly, as we discuss further below, the record before us leaves unclear whether the Nigerian judgments eliminated *all* damages awarded to Esso, including amounts tied to the severable contract violations, as opposed to just the portion remedying the tax dispute. Esso suggests that the apparent wholesale denial of damages amounts to a government taking without due compensation. As the district court observed, it was NNPC's overlifting of oil that deprived Esso of profit—an act that could be viewed as a taking of Esso's property, one that enriched the Nigerian government through NNPC, its instrumentality. The U.S. Constitution generally requires compensation to the property owner when such a taking occurs. *See, e.g.*, *Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235–36 (2003) (explaining that, under the Fifth Amendment Takings Clause, "the private party is entitled to be put in as good a position pecuniarily as if his property had not been taken" by the government (internal quotation marks omitted)). *Cf. Pemex*, 832 F.3d at 110 (concluding that "[t]he enforcement of a [new, retroactively applied] law" to shield a government agent from any liability "amounted a taking of private property without compensation for the benefit of the government" and was among factors warranting disregard of primary jurisdiction's award nullification).

In some circumstances, however, legitimate countervailing government interests may be considered in ordering payment of damages for interference with private

30

property rights. United States law imposes a range of rules and norms that can shield state-affiliated parties from damages obligations notwithstanding property rights violations. For example, the Eleventh Amendment bars a court from ordering a state to pay retrospective damages for a violation of federal law, even as it may allow prospective injunctive relief to redress the same violation. *See Edelman v. Jordan*, 415 U.S. 651, 664 (1974). *Cf. Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 134 (2d Cir. 2015) (explaining that "[t]he Eleventh Amendment generally bars suits in federal court by private individuals against non-consenting states," and "immunity from suit" applies to "certain actions against state agents and instrumentalities."); *Ladd v. Marchbanks*, 971 F.3d 574, 579 (6th Cir. 2020) (reasoning that states' immunity extends to claims brought under the Takings Clause). Similarly, a declaratory ruling that NNPC violated Esso's contractual rights could function as an appropriately remedial order providing prospective injunctive relief, even if the court does not order payment of damages for past takings. *See, e.g.*, NNPC Br. at 12 (describing the Court of Appeal judgment in the set-aside action as "reinstating those terms of the Award that *directed NNPC prospectively* to operate the PSC in accordance with [Esso's] lifting allocations" (emphasis added)). Under these circumstances, the outcome apparently contemplated by the Nigerian Court of Appeal may not be so different from—much less "repugnant" to—what the U.S. legal system might reach in some roughly analogous circumstances. Accordingly, we are unable to conclude from the face of the Nigerian appellate judgments that they "clearly" offend basic standards of justice in the United States.

Esso submits that the judgments were not the result of legal reasoning under Nigerian law but were politically motivated decisions driven by the results desired. In support, Esso points to evidence drawn from other cases involving potential NNPC liability, contending, for example, that Nigerian courts have not ordered NNPC to pay damages to any international company in the last two decades. On this basis it argues

that, for purely political reasons, the Nigerian courts are generally unwilling to rule against the state and are especially unwilling to do so here. Esso urges us to reach the sweeping conclusion that the Nigerian judiciary is "incapable of providing [Esso] an impartial tribunal." Esso Br. at 50. In further support of this general condemnation, Esso submitted written declarations by two experts: one, a former State Department official with expertise on Nigeria; the second, a retired justice of the Nigerian Supreme Court. The thrust of both declarations is that the political realities of the Nigerian judiciary generally result in flawed decision-making and specifically disadvantage international organizations seeking to hold the state liable.

This argument sweeps too broadly to compel the outcome Esso desires here. *See, e.g.*, *Pemex*, 832 F.3d at 108 ("We are concerned here with the effect of [the retroactively applied law in the primary jurisdiction] in *these circumstances* and upon *these parties*." (emphasis added)). Evidence that a judicial system has no independence from the political arms of the state may be relevant to assessing the fairness of a particular private litigant's treatment, as it was in *Pemex*. But broad, nonspecific evidence does not form an appropriate basis for a judicial conclusion in U.S. courts that a specific foreign judgment is necessarily repugnant to notions of justice in this country so as to require the abandonment of comity. *Cf. In re Arbitration between Monegasque de Reassurances S.A.M. v. NAK Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002) ("We have been reluctant to find foreign courts 'corrupt' or 'biased.'"); *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation. Such an assumption would directly conflict with the principle of comity." (internal quotation marks omitted)). Esso offers no specific evidence of unfairness toward it in the ongoing Nigerian litigation other than that the result thus far has

primarily favored NNPC and that results in most other Nigerian cases involving NNPC generally appear to have favored NNPC over international counterparts.[15]

Nonetheless, Esso submits that, because the Nigerian courts have prevented it from receiving any damages for NNPC's breach (including through the trial court's dismissal of Esso's direct substantive action for breach of contract), there is no Nigerian forum in which it can obtain a remedy. But this argument is premature: the record shows that Esso is continuing to pursue damages or a tax refund for the overlifted oil in four ongoing proceedings in Nigeria. These include appeals from the two underlying Court of Appeal judgments (pending before the Supreme Court of Nigeria); an appeal from the trial court's dismissal of Esso's direct, substantive action (also pending before the Supreme Court); and Esso's action in the Nigerian tax tribunal. That these proceedings are ongoing creates yet another barrier to concluding that Esso has been denied due process: it remains to be seen how the Nigerian courts will ultimately treat Esso and the Award.[16]

Because at this juncture Esso has not clearly shown that the Nigerian judgments partially setting aside the Award are "repugnant to fundamental notions of what is decent and just in this country," *Pemex*, 832 F.3d at 97 (internal quotation marks

---

[15] To the extent that other cases involving Nigerian state entities have any relevance to our task, we note in any event at least some evidence that the results of those cases are not quite so imbalanced as Esso portrays. *See, e.g.*, Br. of *Amici Curiae* FIRS et al. at 11–13 (listing recent Nigerian court decisions ruling against NNPC and Nigerian state entities, including some judgments requiring Nigeria to pay tens of millions of dollars to non-Nigerian entities).

[16] In contrast, in *Pemex*, the petitioner's claims had been wholly rejected by the Mexican courts based on "unforeseen changes in the law," including a dramatically shortened statute of limitations period, and no related judicial proceedings were still pending. *Pemex*, 832 F.3d at 110. We concluded that the petitioner's "inability to have its breach claims heard magnifie[d] the injustice" it faced in the primary jurisdiction. *Id.* So far as we are aware, Esso is not similarly foreclosed from participation in further proceedings, and its claims have not been entirely barred.

omitted), on the record before us, we are unconvinced that the district court abused its discretion in affording comity to those judgments.

## 2. *The Award is enforceable in part*

Although the district court acted well within its discretion by extending comity to the Nigerian Court of Appeal judgments, we conclude still that the district court erred by failing to delineate and enforce those portions of the Award that those judgments reinstated. As described above, U.S. courts are generally bound to enforce an award that has not been set aside in the primary jurisdiction. *See* 9 U.S.C. § 207. Because no exceptions to enforcement apply with respect to the portions of the Award that the Nigerian Court of Appeal reinstated, it follows that the district court must enforce those portions of the Award. By failing to do so, the district court erred.

Although we conclude this is the result the law requires, we acknowledge that the practical effect of this conclusion is unclear at this stage. The record consistently shows that the Nigerian judgments reinstated the requested declaratory relief, and so presumably affirmed the arbitral panel's liability finding against NNPC. But the language of the Nigerian judgments is ambiguous in some respects: critically, we are unable to decipher whether those judgments set aside *all* damages that the Award found were payable to Esso—that is, the entire $1.8 billion Award, with interest accruing thereafter. For example, one of the judgments declared that it set aside "damages or compensation to [Esso] for the overlifting of crude oil cargoes *in the amount that includes the PPT paid*." App. 749 (emphasis added). We are unable to determine whether the "amount" set aside refers to the entire damages award or only to "the PPT" (that is, the tax) portion of damages associated with the tax issue that the Court of Appeal deemed inarbitrable and severable. If the latter, then it is unclear what amount of damages was reinstated and therefore may be deemed payable in an enforcement order, to the extent that such an order is otherwise appropriate. At oral

34

argument in this Court, counsel for Esso reluctantly quantified the damages for overlifted tax oil alone as amounting to $1.5 billion of the $1.8 billion Award—leaving approximately $300 million in other damages—but we identify no support in the existing record for any precise numbers.

We therefore remand the case to the district court to allow it to resolve these issues with the parties' aid. The district court should engage in any additional fact-finding and briefing it deems necessary or appropriate to clarify the effects of the Nigerian judgments. This task includes, at least, determining whether to order any partial damages payment by NNPC and, if so, in what amount and on what basis. After addressing these and any other remaining issues (and any new issues that may surface in time), the district court should fashion a partial enforcement order consistent with this Opinion and with its own additional findings.[17]

## CONCLUSION

Esso seeks the enforcement of an arbitral award in its favor (and against a Nigerian-owned entity) that courts in Nigeria, the primary jurisdiction, have partially set aside. The district court denied enforcement. Applying *Pemex*, it concluded that Esso had not carried its burden of showing that the Nigerian judgments setting aside the Award were offensive to basic notions of justice and decency in the United States, making their enforcement contrary to public policy. Accordingly, it afforded comity to those judgments and declined to enforce any part of the Award. On review, we agree that Esso failed to meet the high bar established by *Pemex*. The district court erred, however, in failing to enforce those portions of the Award that the Nigerian Court of Appeals reinstated. With the parties' aid, obtained in whatever form it deems

---

[17] Esso is, of course, free to renew its request to stay this case on remand pending resolution of the Nigerian proceedings. The question whether to enter a stay pending such resolution would be committed to the district court's discretion.

appropriate, the district court's task will be to determine the contours of the Nigerian judgments and enter an enforcement order consistent with those judgments.

Because we reinstate a portion of the action in the district court, we further entertain NNPC's cross-appeal and conclude that the district court had personal jurisdiction over NNPC and did not err by declining to dismiss the enforcement petition for *forum non conveniens*.

We therefore **AFFIRM IN PART** and **VACATE IN PART** the district court's judgment denying Esso's petition, and we **REMAND** the case for further proceedings consistent with this Opinion.